^Opinion of the court, by
Judge Burnet:
The pleadings and exhibits present a number of questions which *168 have been argued by counsel at considerable length, but which the court have not thought it necessary either to consider or decide. Our attention has been directed to two questions only, which seem to embrace the merits of the case.
1. The effect of the several surveys made at different times on the entry in the name of Tench, assignee.
2. The true construction of Bose’s entry, No. 441, on which all the subsequent entries, including those in dispute, connected with it on the river above, must necessarily depend.
These questions are to be decided on the following facts: In August, 1787, one Lawson made an entry, No. 439, on the Scioto river, beginning at a point on the bank, eight miles above the mouth of Paint creek. On the same day, Blair made an entry, No. 440, of one thousand acres, beginning at Lawson’s upper corner on the river, running up the river four hundred poles, when reduced to a straight line; thence at right angles from the general course of the river, and with Lawson’s line, for quantity. Bose made an entry, No. 441, of one thousand acres, on the Scioto river, beginning at the upper corner of A. Blair’s entry, No. 440, on the bank of the river, running up the river four hundred poles, when reduced to a straight line ; then at right angles from the general course of the river, and with Blair’s lino for quantity.
Caines then entered one thousand acres, beginning at the upper corner of Bose.
White entered two thousand acres, beginning at the upper corner of Caines.
Coleman entered one thousand acres, beginning at the upper corner of White.
Jordan entered one thousand acres, beginning at the upper corner of Coleman.
Galt, under whom the defendants claim, entered one thousand acres on the Scioto river, beginning at the upper corner of Jordan’s entry, No. 449, on the bank of the river, running up the river four hundred poles, when reduced to a straight Nine; thence at right angles to the general course of the river, and with Jordan’s line for quantity.
Biddle then entered one thousand acres, beginning at the upper corner of Galt.
John Tench, assignee, under whom the complainant claims, then entered twelve hundred acres, part of military warrant, 2,377, on *169 the Scioto, beginning at tbe uppor corner of C. Biddle’s entry, No. 452, running up the river five hundred poles, when reduced to a straight line ; thence from the general course of the river at right angles, and with Biddle’s line for quantity.
These entries were all surveyed in 1793, by a deputy regularly appointed, and most of them have been settled and improved many years.
In 18Ü7, eight hundred acres ofthe entry in the name ofTench,assignee, were withdrawn and located, and surveyed on other lands.
In 1809, four hundred acres, residue of the above entry of Tench, assignee, were again surveyed by D. McArthur, an authorized deputy, in such form that the length oí the survey was five hundred and twenty-six poles and its breadth one hundred and twenty-four poles.
In 1823, the same four hundred acres were again surveyed by D. McArthur, in two separate surveys, so as to include a part of the survey of Biddle and a part of the survey oí G-alt, which now belongs to the defendants.
From a correct diagram of Blair’s entry, 440, it appears that he has three corners on the Shioto river, one at each extremity of his base, and one where his back line'intersects the river.
Rose surveyed from the uppermost or third corner on the river, and all the subsequent entries, including that of the complainants, have been surveyed in conformity with it.
The complainant now contends that the beginning cornet of Rose is the Becond corner of Blair on the river, at the upper extremity of his base.
The county surveyor has reported that the entry of Rose can not be laid down or surveyed from that corner as a beginning.
The entry in the name of Tench was made on a military warrant granted to Dr..Trezvant, who, it is said, never assigned to Tench, or authorized an entry in his name.
*The complainant claims by assignment from Wallace and Woodbridge, who claimed as assignees of Trezvant, and deny the right of Tench.
Without stopping to examine the validity of the assignments on either side, I shall take it for granted they are regular, and that the complainant has acquired a valid right to the entry in the name of Tench, assignee.
1. The first inquiry then is, what is the effect of the different *170 surveys that have been made on the entry in the name of Tench, assignee?
The complainant alleges that Tench, having made the entry in his own name without authority, must be considered as a trustee for him. He therefore affirms the entry and claims the benefit of it, but contends that the first and second surveys were made without authority, and that the only authorized survey is the one made by his direction in 1823. It is difficult to account for the fact that this entry was permitted by the principal surveyor without evidence of an assignment. But taking it for granted that the entry was obtained by the practice of a fraud on the officer, or in consequence of his negligence and inattention; yet, as the complainant has sanctioned it after it was surveyed and recorded in the name and as the property of Tench, it would seem that he has recognized the power by which both the entry and the survey were made.
In addition to this, it is in proof that the surveys of 1793 and 1809 wore made by regular and authorized deputies; it is, therefore, to be presumed that they were made legally and on proper authority. The officers were acting under the obligation of an oath, and on their personal and official responsibility. In the absence of all proof, therefore, we are to take it for granted that the person having the control of the warrant directed the survey, and that it was executed in conformity with such direction.
The objection to these surveys seems to rest on the supposition that Tench ordered them. But there is no evidence of that fact. If Tench had not the control of the location, as is contended, the survey may have beon directed by Trezvant, or some other person who had an interest in the land, or a power to manage it. On any other supposition it would bo impossible to sustain half the surveys that have been *made in the district; and when it is remembered that the fiiot survey was made many years before the existence of the complainant’s right, and before the alleged assignment by Trezvant to Wallace, we can readily understand why it is that this complainant has no knowledge of the transaction. His want of information, however, does not change its character. Trezvant has never disavowed it, nor is there any proof that it was made without his authority. Wallace certainly knew the situation of the location before ho purchased, and that he was bound by all the steps that had been legally taken toward the completion of *171 the title, and yet he has shown no disavowal either by Trezvant or Tench. The inference from this fact, in connection with the credit which must be given to the official acts of a sworn deputy, is irresistible. As the case is presented, I can not discover any difference between the validity of the entry and that of the survey. They rest on the same ground, depend on the same evidence, and must stand or fall together. If the absence of testimony be sufficient to condemn the survey, the entry must share the same fate, for they must be presumed to have been made by the same person, or at least under the same authority. The distinction between them, which counsel have endeavored to make, does not appear to me to have any foundation to support it. The whole process of consummating a-title, from the emanation of the warrant to the granting of the patent, is one transaction, though consisting of different parts; and the assignee of a warrant takes it in the state of progress toward a complete title in which it is found at the time of his purchase, but with the same right of the original holder to disavow any step that may have been taken illegally or without authority. Such illegality, or want of authority, however, is not to be presumed, nor is it to be admitted on the bare assertion of the assignee, who must have been a stranger to the transaction at the time it took place. The law presumes that to be legally done, which is done by an officer vested with competent authority, and on the supposition that the first survey was made by such an officer, the assignee is bound by it, though by a fair construction of the entry it might have justified a different survey. This survey of 1793-does not conflict with the survey of the defendants, wThieb includes *the land now in dispute, and being the survey by which tho complainant is bound, he can not take anything by his patent which is founded on the survey of 1823.
2. The second question is, what is the correct construction of Hose’s entry, No. 341, on which the position of Tench’s entry must depend ?
Rose calls for the upper corner of Blair’s entry, on the river, as his beginning. It is necessary, therefore, to ascertain that corner.
The complainant contends, that it must be the upper corner of Blair’s base line; but according to my apprehension, it is the upper corner of his entry without reference to any particular line. In most cases, whore both ends of a base line terminate at points on *172 a watercourse, and the call is to look back for quantity, the upper corner on the base will be the upper corner of the entry, on the river; but it may happen, that by a sudden bend in the course of' the stream, the third corner of the entry is the upper corner on the river. The base line alone does not constitute an entry. It must be taken in connection with the other calls. An entry is neither more nor less 'than a location, and when we speak of an entry we mean a tract of land, with defined though unsurveyed boundaries, that must necessarily have more than two corners.The calls of Blair’s entry places two of his corners on the river, with certainty, but it necessarily includes two other corners, which may or may not be on the river. A valid entry must be certain and precise, and must contain the means of ascertaining its boundaries in order that others may locate the adjoining land with safety. , This entry is admitted to be good. It must, therefore, contain the means of ascertaining all its corners with certainty. This being the case, it is a natural conclusion that Rose, in making his entry, ascertained the situation of Blair’s entry, without which he must have located at random, and might have called for the same land which Blair had previously entered. In ascertaining the situationmf that entry, he certainly knew that no part of it could lie, or be 'intended to lie, on the east side of the river; and that although the second line, as called for, might cross the river, yet the entry could not include land, or have a boundary or a corner on the east side; but the river would become its boundary, from *the point where the line should cross, and, consequently, that its uppermost corner, on the river, would be the point where that line or the next called for should cross for the last time. A protraction of this entry shows that the second line crosses the river and terminates out of the military district, and that the third line recrosses and continues a considerable distance within the district before it terminates. On examining this diagram, if the question be asked, what is the real entry or location of Blair, the answer must be : so much of the land within its lines as is on the west side of the river; or, in other words, the land bounded by the river, from the beginning to the termination of the base, and from the termination of the base to the point whore the back line intersects the river, and by that lino and the line called for in Lawson’s entry. The boundaries of the location being ascertained, another question arises. How many corners has *173 it, and where are they situated ? The eye discovers at once that it has four corners: one at the commencement, and one at the termination of the base; one at the point where the back line intersects the river, and one at the point where that line intersects the line of Lawson. If this exposition be correct, the upper, by which I understand the uppermost corner of Blair’s entry on the river, is his third corner, and is found at the point where his back line intersects the river. Assuming that corner as the beginning of Rose, it will be found that Tench’s entry does not interfere with Galt, and that the survey, by which Tench now claims, does not include any part of the land now covered by his entry.
In construing entries, the intention of the locator should not be disregarded when it can be ascertained. Although it may be in-artificially expressed, it should be made the rule' of construction as far as possible. The evident intention of Rose was to begin on the river, at the point where the boundary of Blair should leave it for the last time. On this supposition he has appropriated the vacant lands contiguous to Blair; but on the complainant’s construction, he has attempted to appropriate the land covered by him. As the complainant has surveyed for him, at least nine hundred and fifty of his thousand acres are within the lines of Blair; and this result must have been evident to the eye of the ^locator when he made his entry. From the termination of Blair’s base the Scioto changes its course. Its bed then became about parallel with his second line, so that a person on the ground would naturally conclude that the third corner of Blair would be on the river, and he would perceive, at once, that by calling for the termination of his base line for a beginning, and thence up the river for the base of his own entry, he would unavoidably cover the principal part, if not the whole of that.entry, instead of making it a boundary as he intended. Here, then, we have the reason why the county surveyor could not lay down, or survey the entry of Rose from Blair’s second corner. It was because Rose’s base would be precisely the second line of Blair, and he would run back for quantity directly through Blair’s entry and include almost the whole o it. In addition to this, it should be remembered that the whole chain of entries, from Lawson to Tench, which seem to have been made on the same day, have been surveyed about thirty years; that they have been occupied and- improved fifteen or twenty years, and some of them more; that Rose’s survey corn *174 menced at tbe third corner of Blair; and that the whole chain of subsequent entries, including Tench’s, were surveyed in conformity with it. These facts show, not only the intention of Rose, but the construction which has been put upon his entry as to its beginning corner by all the locators above him. Tench’s location, claimed by the complainant, stood on a survey made by an authorized deputy, in conformity with the construction now given, from 1793 till 1823, when the complainant ordered a new survey, by which Tench’s location is moved down the river about eight hundred poles, and made to interfere with the surveys of Biddle and Galt, as they were executed in 1793. If this construction prevails the whole chaim of surveys must be removed from the ground on which they were made, and the occupants must lose their improvements, notwithstanding the construction given by Rose to his entry is in conformity with the established rules, consistent with its own terms, and in accordance with the common understanding of those whose locations are connected with it.
If it was the intention of Rose to call for the entry of Blair as a boundary, without interfering with it, his object *eould not be attained in any other way than by taking his uppermost or third corner on the river as a beginning.
In Evans v. Manson, 1 Bibb, 5, the court say, that a locator, calling to join a claim, shall not be intended to interfere with it. In Lipscum v. Grubbs, 3 Bibb, 400, the same rule is given. The court there, rejected a call to run north, because it produced a repugnance by making the entry interfere with a location called for. They decided that the locator meant to say south, but, by mistake, said north; that the idea could not be entertained that he intended to lose four hundred acres by including the claim he had called for, and which he had thereby admitted to be superior to his own; that the whole entry should be taken together, to ascertain the most probable, fair;, and rational meaning of the locator, and that subsequent locators, from a just construction of the entry, might understand the mistake. Now, in the case before us, by assuming the corner, on Blair’s base line, as a beginning, Rose not only interferes with the entry which he calls for as a boundary, but includes at least nine hundred and fifty acres of it, and will not cover more than forty or fifty acres of vacant land, when he intended to locate one thousand acres; but according to the construction by which he has surveyed, he saves his call for Blair as *175 a boundary, prevents all interference, and obtains his quantity of land. No person can mistake his meaning for a moment. The locator next above him clearly understood it, and surveyed his entry accordingly, and those adjoining, for an indefinite extent, have understood and surveyed in the same way. The complainant himself, or those under whom ho holds, have also surveyed on the same principle, and acquiesced in it for nineteen years.
.From the loose manner in which entries have been made in this district, as well as in Kentucky, great latitude has been taken to make the language used, conform to the intention of the locator. In the case of Massie v. Watts, 6 Cranch, 857, the Supreme Court admit the necessity of establishing rules, to save locations that would otherwise be defective for want of that degree of certainty which is required for the safety of subsequent locators, and they decided the case on the principle that they were bound to support the entry, if, by any reasonable construction, it could *be supported. In speaking of the possible result of Massie’s construction, the chief justice says : “ Powell’s back line would probably terminate on the river, in which event that would be his upper corner on the Scioto, which is called for as the beginning of O’Neal’s entry.” Now, the diagram of Blair’s entry and survey returned by the county surveyor, shows that his back line does terminate on the Scioto, above his base, consequently that must be his upper corner on the river, which is called for by Rose.
From this view of the case, it follows that whether the complainant was bound by the survey of 1793 or not, a proper construction of the entries, on which his own depends, will place his location entirely above the limits of G-alt’s survey, as it is now claimed by the defendants. The bill, therefore, must be dismissed.